**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 10-cv-02573-CMA

BERNADETTE RANGEL,

     Plaintiff,

v.

MICHAEL ASTRUE, Commissioner of Social Security,

     Defendant.

---

## ORDER AFFIRMING ADMINISTRATIVE LAW JUDGE'S DECISION

---

This matter is before the Court on Plaintiff Bernadette Rangel's appeal of the Commissioner's April 22, 2010 decision denying her claim for Disability Insurance Benefits and Supplemental Security Income pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34 and 1381-83.  Jurisdiction is proper under 42 U.S.C. § 405(g).

## I.  BACKGROUND

Plaintiff Rangel was born in 1963, and was 43 years old on her alleged onset disability date of September 14, 2007.  Plaintiff has an eleventh-grade education and has past relevant work as a stocker, grocery clerk, and bus driver.  (AR 57, 124, 158, 168.)

Plaintiff alleges disability due to tendonitis in her hands and feet, diabetes, hernia, depression, anxiety, and achalasia,[1] a disorder of the esophagus that impairs one's ability to swallow food (AR 39, 153).

Plaintiff applied for Disability Insurance (Title II) and Supplemental Security Income (Title XVI) benefits on April 4, 2008.  (AR 64-65, 124-133.)  Her claims were initially denied on July 17, 2008.  (AR 64-65, 69-74.)  An administrative hearing was held in connection with Plaintiff's claims on March 30, 2010.  (AR 31-63.)

## A.    HEARING BEFORE THE ALJ

At the Hearing, Plaintiff testified as to the nature of her disabilities and her daily activities.  Plaintiff first testified about how she is affected by achalasia, a disorder of the esophagus that makes it very difficult and painful for her to swallow food and which causes food to get trapped in her esophagus.  (AR 35-39.)  Although her doctors recommended surgery, Plaintiff admits that she has not had the procedure.  To treat the pain, Plaintiff takes Nexium, which is typically used for heartburn.  (AR 36-40.)

Plaintiff then testified about how she is affected by a hernia.  Although Plaintiff had hernia surgery in August 2008, she stated that she still feels pain and may need additional surgery.  (AR 40.)[2]

---

[1]  Plaintiff first mentioned this disorder at the March 30, 2010 Hearing before the Administrative Law Judge.  (AR 35-39.)

[2]  At the Hearing, Plaintiff testified that the surgery revealed that she had five hernias. However, the medical records reflect that Plaintiff had only three hernias.  (*See* AR 347.)

2

Plaintiff also discussed how she is affected by carpal tunnel in her hands and feet.  (AR 41-44.)  Plaintiff stated that, despite having had two surgeries on her feet, her feet "always hurt[ ]," are always inflamed, red, and swollen.  (AR 41.)  Plaintiff cannot stand for long and she can walk only two or three blocks before she has to sit.  (AR 42.)  Plaintiff also stated that her doctors recommended surgery on her hands to treat the carpal tunnel syndrome, but that she has not yet had this surgery because, at the moment, she is mainly concerned with her eating problems.  (AR 42.)  Instead, Plaintiff uses a splint on her right harm and takes Ibuprofen.  (AR 43, 48.)[3]

Additionally, Plaintiff discussed her daily activities, which include keeping her room in her friend's house clean, staying at home, going to a nearby convenience store to pick up a few items, preparing microwaveable meals, and taking naps. (AR 44-46, 50.)

Plaintiff also testified as to the nature and severity of her anxiety attacks, for which she takes Lexapro.  (AR 48-51.)  Plaintiff stated that she suffers anxiety attacks about three or four times a week, during which her hands start to sweat, she gets hot, her heart starts to race, her vision is affected, and she feels out of sorts.  (AR 49.)  Fear or nervousness tend to precipitate the attacks.  (*Id.*)

---

[3]   In connection with the carpal tunnel syndrome in her right arm, Plaintiff also testified that her "bone[ ] pops out a lot, it gets real inflamed."  (AR 43.)  However, none of the submitted medical records reveal that Plaintiff has ever raised this health issue with any of her doctors.

Plaintiff also discussed the extent to which she experiences auditory halluci-nations, stating that, although she used to experience daily hallucinations, she now experiences them about four times a week.  (AR 50.)[4]

Finally, Plaintiff stated that she experiences incontinence as a side-effect of her medications and, as a result, she wears pads "on a daily basis."  (AR 51.)

With respect to her ability to work with others, Plaintiff stated that she had a lot of problems being distracted by co-workers and she did not think that she could respond appropriately to supervisors.  (AR 52.)  Additionally, without any explanation, Plaintiff stated that she has problems: remembering things, such as what she did the day before; working at a consistent pace; and needing extra rest periods on a job, in addition to two 10- or 15-minute breaks and a 30-minute lunch break.  (AR 53.)

**B.    VOCATIONAL EXPERT TESTIMONY**

Amy Spinelli, a vocational expert testified at the Hearing.  She opined on a number of hypotheticals posed by the ALJ, as well as hypotheticals posed by Plaintiff's attorney.  (AR 56-62.)

First, the ALJ inquired about whether someone who could perform the full range of light work would be able to perform Plaintiff's past jobs as a grocery store clerk or a bus driver, to which the vocational expert responded in the affirmative.  (AR 57.)

---

[4]   This testimony is also inconsistent with the submitted medical records, which reflect a reduction in auditory hallucinations.  (*See* AR 308) (dated January 20, 2009 – over one year prior to the March 30, 2010 Hearing before the ALJ) ("voice has been fading").

Second, the ALJ inquired about whether someone would still be able to perform those jobs if they could only occasionally perform light work and occasionally "grasp and finger with the right dominant upper extremity," to which the vocational expert responded that such individual would not be able to perform past jobs as a grocery store clerk and bus driver.  (AR 57-58.)

Third, the ALJ inquired about whether other jobs would be available for a "younger individual with a limited education," to which the vocational expert responded in the affirmative and identified three jobs of light physical demand: usher or ticket taker, retail sales attendant, and dispatcher or routing clerk.  (AR 58.)

Fourth, the ALJ inquired about the availability of jobs for an individual who could only have occasional contact with the general public; the vocational expert stated that such a limitation would eliminate the usher and retail sales attendant jobs, but the dispatcher routing clerk would not be affected because that position does not involve direct, face-to-face contact.  (AR 58.)  Additionally, the vocational expert identified two other light physical demand jobs: (1) assembler of small products, which requires frequent reaching and handling but only occasional fingering and grasping, and (2) sorter of produce, which does not require any fingering, but requires occasional reaching and constant handling.  (AR 58-59.)

Fifth, the ALJ inquired about an individual's ability to perform any of the identified jobs if the individual could only stand and walk two hours in an eight-hour work day.  (AR 59.)  The vocational expert stated that such a limitation would eliminate the produce

sorter position, the retail sales attendant, and the usher; the individual would still be able to perform the dispatcher and assembler jobs.  (AR 59.)

Sixth, the ALJ inquired about the individual's ability to adapt to changes in a routine work environment, to which the vocational expert responded that such an individual would have difficulty to sustain competitive employment in the unskilled fields. (AR 59.)

Next, Plaintiff's attorney posed the following questions to the vocational expert:

First, Plaintiff's attorney inquired about employers' flexibility regarding absences, or an employee's need to leave early or arrive late, or an employee's need to take a one-hour lunch break, instead of a thirty-minute lunch break.  The vocational expert responded that employers would typically only allow one or two absences per month and would only allow a one-hour lunch if the two ten- or fifteen-minute breaks were eliminated.  (AR 60.)

Second, Plaintiff's attorney asked whether the identified jobs would allow Plaintiff to have extra supervision, and whether an inability to work in coordination or in proximity to others without being distracted would impact an individual's ability to perform the identified jobs.  (*Id.*)  With respect to extra supervision, the vocational expert stated that extra supervision would be provided only during the training period.  With respect to an inability to work with others without being distracted, the vocational expert stated that such inability would affect the retails sales attendant and usher positions, but not the assembler, dispatcher, or sorter of produce positions.  (*Id.*)

6

Third, Plaintiff's attorney asked whether an individual's inability to perform at a consistent pace and to "meet competitive standards in accepting instructions and responding appropriately to criticisms from supervisors" would affect the identified jobs, to which the vocational expert responded that such limitations would eliminate those positions.  (AR 61.)

Finally, Plaintiff's attorney asked whether an individual's inability to stand for more than ten minutes at a time would affect her ability to perform the duties of a dispatcher or assembler, to which the vocational expert responded in the negative. (AR 62.)

## C.    THE ALJ'S DECISION

On April 22, 2010, the ALJ issued a decision, finding that Plaintiff was not disabled.  (AR 20-26.)  The ALJ determined that:

(1)    At Step One, Plaintiff has not engaged in substantial gainful activity since September 14, 2007, the alleged onset date;

(2)    At Step Two, Plaintiff has the following severe impairments: carpal tunnel syndrome and obesity;

(3)    At Step Three, Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)    Plaintiff has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that the claimant is limited to frequent handling/grasping and fingering with the right hand;

(5)    Although Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the

symptoms are not credible to the extent they are inconsistent with the ALJ's RFC assessment;

(6)     At Step Four, Plaintiff is unable to perform any past relevant work as an overnight stocker, grocery clerk, and bus driver;

(7)     At Step Five, Plaintiff has **not** been under a disability, as defined under the Social Security Act, from September 14, 2007, through the date of the ALJ's decision.

(AR 15-26.)

On May 5, 2010, Plaintiff filed a request with the Appeals Council for review (AR 8-9), which the Council denied on August 24, 2010.  (AR 1-5.)  On October 21, 2010, Plaintiff filed a civil action, seeking judicial review of the denial of Social Security benefits.  (Doc. # 3.)  The Social Security Administrative Record was filed with the Court on December 23, 2010.  (Doc. # 8.)  On February 22, 2011, Plaintiff filed her Opening Brief (Doc. # 11).  Defendant, the Commissioner of Social Security, responded on March 22, 2011 (Doc. # 12), and Plaintiff replied on April 1, 2011 (Doc. # 13).  On June 6, 2011, the parties presented oral argument to the Court; the Court reserved ruling. (Doc. # 16.)

In this appeal, Plaintiff asserts a laundry-list of errors that the ALJ purportedly committed; these purported errors can be condensed to the following list of three:

(1)     Whether the ALJ improperly evaluated Plaintiff's impairments at Step Two of the evaluation process;

(2)     Whether the ALJ improperly evaluated Plaintiff's credibility and the medical source opinion evidence; and

(3)     Whether the ALJ's RFC determination was supported by substantial
        evidence.

Doc. #11 at 5-6).[5]

## II.  <u>STANDARD OF REVIEW</u>

### A.     STANDARD OF REVIEW

The Court reviews the Commissioner's decision to determine whether substantial
evidence in the record as a whole supports the factual findings and whether the correct
legal standards were applied. *See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).
"Substantial evidence is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion. It requires more than a scintilla, but less than a
preponderance." *Id.* (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)).
The Court does not re-weigh the evidence or substitute its judgment for that of the
Commissioner. *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).

### B.     EVALUATION OF DISABILITY

The qualifications for disability insurance benefits under the Social Security Act
are that the claimant meets the insured status requirements, is less than sixty-five years
of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).
The Social Security Act defines a disability as an "inability to engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment
which can be expected to result in death or which has lasted or can be expected to last

---

[5]   All citations to page numbers refer to the numbering used by the Court's CM/ECF
docketing system and not to the document's actual page numbering.

for a **continuous** period of not less than *twelve* months." 42 U.S.C. § 1382c(a)(3)(A)

(2006) (emphasis added).  "[A] medical finding of disability is not based solely on

objective test results. It includes an evaluation of the patient's medical history and the

physician's observations of the patient, and necessarily involves an evaluation of the

credibility of the patient's subjective complaints[.]"  *Nieto v. Heckler*, 750 F.2d 59, 61-62

(10th Cir. 1984).

### III.  ANALYSIS

**A.   WHETHER THE ALJ IMPROPERLY EVALUATED PLAINTIFF'S IMPAIRMENTS AT STEP TWO**

Plaintiff asserts that the ALJ erred at Step Two of the sequential evaluation

process by improperly evaluating her impairments.  (Doc. # 11 at 5-6, 11-12.)

In particular, Plaintiff asserts that the ALJ "failed to follow the 'slight abnormality'

standard," under S.S.R. 96-3p, when finding that Plaintiff's mental impairments

and achalasia are non-severe.  Specifically, Plaintiff states that Plaintiff's mental

impairments and achalasia are not "slight abnormalit[ies]," but rather, have "more than

a minimal effect on the ability to do basic work activities."  (*Id.* at 11) (quoting S.S.R.

96-3p).  With respect to her mental impairments, Plaintiff points to the fact that she "has

been seeking mental health treatment most recently since September 2008 at Stout

Street Clinic," has been assessed GAF scores from 40-45,[6] and Dr. Burton Rosenblum,

---

[6]   A GAF score of 41-50 shows "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." (Doc. # 11 at 11) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed. 1994 (DSM-IV)).

a consulting examining psychologist who saw Plaintiff on a single occasion, determined

that Plaintiff has marked restrictions in activities of daily living and extreme difficulties in

social functioning and in maintaining concentration, persistence, or pace.  (*Id.*)  With

respect to the achalasia disorder, Plaintiff points to the fact that the condition causes her

pain throughout the day and night, causes vomiting, affects her sleep, and requires her

to stand while eating and to eat more slowly.  (*Id.* at 12.)

"At step two, the claimant must show that [she] has a medically severe

impairment or combination of impairments." *Lax v. Astrue*, 489 F.3d 1080, 1084

(10th Cir. 2007).  An impairment or combination of impairments is "severe" within the

meaning of the regulations if it significantly limits an individual's ability to perform basic

work activities. Basic work activities are:

> abilities and aptitudes necessary to do most jobs, including walking,
> standing, sitting, lifting, pushing, pulling, reaching, carrying or handling;
> seeing, hearing, and speaking; understanding, carrying out, and
> remembering simple instructions; use of judgment, responding
> appropriately to supervision, coworkers, and usual work situations;
> and dealing with changes in a routine work setting.

*Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) (citations and quotation

marks omitted).

In contrast, an impairment or combination is "not severe" when medical and other

evidence establish only a slight abnormality or a combination of slight abnormalities that

would have no more than a minimal effect on an individual's ability to work.[7]  "[W]hile

---

[7] *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28,
96-3p, and 96-4p.

the showing a claimant must make at step two is de minimis, a showing of the mere presence of a condition is not sufficient." *Cowan v. Astrue*, 552 F.3d 1182, 1186 (10th Cir. 2008) (citing *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003)). Step Two is designed "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009) (unpublished) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 156 (1987) (O'Connor, J., concurring)). "[A] claimant is required to establish, and an ALJ is required to find, only one severe impairment." *Id.* "As long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step. Accordingly, the failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds [as in the instant case] that at least one other impairment is severe." *Id.*

In the instant case, although the ALJ determined that Plaintiff's anxiety and achalasia were non-severe impairments,[8] the ALJ addressed the balance of the sequential evaluation process because she determined that Plaintiff's carpal tunnel syndrome and obesity were severe impairments; they "cause more than a minimal effect on [Plaintiff's] ability to perform work-related activities." (AR 15.) To the extent

---

[8]   During oral argument before this Court, Plaintiff's attorney asserted that the ALJ failed to consider the limitations caused by achalasia. (*See* Rough Transcript of June 6, 2011 Oral Argument at 9:10:52 to 9:11:18.) However, the ALJ's April 22, 2010 Decision shows that this is not so. Specifically, the ALJ stated, "there is no evidence that [Plaintiff's] achalasia cause[s] more than a minimal affect on [Plaintiff's] ability to perform basic work activities. In addition, records from Denver Health Medical Center and the Stout Street Clinic indicate that the claimant takes Nexium for this condition, which reasonably controls her symptoms . . . ." (AR 16) (internal record citation omitted).

that Plaintiff objects to the ALJ's non-severity determination on grounds that the

achalasia disorder causes her pain, the Court notes that "[t]he inability to work pain-free

is not sufficient reason to find a claimant disabled." *Jaramillo v. Massanari*, 21 F. App'x

792, 796 (10th Cir. 2001) (unpublished) (citing *Gossett v. Bowen*, 862 F.2d 802, 807

(10th Cir. 1988)); *Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986) (quoting

*Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983)) ("[D]isability requires more

than mere inability to work without pain.  To be disabling, pain must be so severe, by

itself or in conjunction with other impairments, as to preclude any substantial gainful

employment.").

Accordingly, because the ALJ proceeded with the balance of the sequential

evaluation process after she determined that Plaintiff had at least one severe

impairment, the Court finds that the ALJ's Step Two-determination that Plaintiff's mental

impairments and achalasia were non-severe is not erroneous.  Therefore, Plaintiff's

request to reverse the denial of SSA benefits is denied to the extent it is premised on

a purported error at Step Two.

**B.   WHETHER THE ALJ IMPROPERLY EVALUATED PLAINTIFF'S CREDIBILITY
AND THE MEDICAL SOURCE OPINION EVIDENCE**

1.   Evaluation of Plaintiff's Credibility

Next, Plaintiff asserts that the ALJ failed to provide specific rationale for rejecting

Plaintiff's testimony, as required under S.S.R. 96-7p.  (Doc. # 11 at 6, 16.)  To the

contrary, the Court finds that the ALJ provided a thorough explanation for why she

found Plaintiff's allegations of disability "not credible."  (AR 22.)

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).  "Substantial evidence is adequate relevant evidence that a reasonable mind might accept to support a conclusion." *Kepler v. Chater*, 68 F.3d 387, 388-89 (10th Cir. 1995) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991)). "Subjective pain must be evaluated with due consideration for credibility, motivation, and medical evidence." *Nieto v. Heckler*, 750 F.2d 59, 61-62 (10th Cir. 1984).

"In assessing the credibility of pain testimony, various factors are relevant, including: 'the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.'" *Mann v. Astrue*, 284 F. App'x 567, 571 (10th Cir. 2008) (unpublished) (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1273-74 (10th Cir. 2004)); *see also Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (stating that the ALJ may look to a claimant's attempts to relieve her symptoms when ascertaining a claimant's

credibility); *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992) (noting discrepancies between the claimant's statements of his daily activities in his disability application and in his testimony).

In the April 22, 2010 Decision, the ALJ determined that, although Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment," and "the objective medical evidence and nonmedical evidence do not support the claimant's alleged symptoms and limitations."  (AR 21.)  In reaching her credibility determination, the ALJ pointed to four sets of records.  First, the ALJ discussed the objective medical evidence contained within the files of Laura Moran, M.D., who performed a medical consultative examination at the request of the State disability agency.  (AR 231-36.)  Dr. Moran suspected that Plaintiff "attempted to exaggerate her problems."  (AR 232.)  Dr. Moran noted that Plaintiff appeared in "no acute distress" (AR 231), but Plaintiff nevertheless complained of "severe pain" when Dr. Moran touched Plaintiff's right biceps muscle, hips and leg, and stated that she always experienced pain at a level of 8 on a ten-point scale.  (AR 232-34.)  Dr. Moran also noted that Plaintiff had "give away weakness of every muscle group tested in all extremities to include shoulders, hands, wrists, elbows, knees and hips."  (AR 234).  Tellingly, Plaintiff exhibited this "give away weakness"

despite having "normal" range of motion in her spine,[9] shoulders, and extremities;

despite the fact that Plaintiff had a normal gait, walked without any assistive devices,

was able to squat, and was able to arise from the exam chair and table without

assistance; and despite the fact that Plaintiff scored a 5 out of 5 on major muscle group

strength testing of her elbows, shoulders, hands, wrists, hips, and knee.  (AR 233-34.)

Additionally, Dr. Moran noted that, despite Plaintiff's complaints of severe pain in her

feet and hands, Plaintiff had not sought treatment for her feet for at least a year and she

took only Advil for her carpal tunnel syndrome.  (AR 231.)  Dr. Moran also noted that x-

rays taken of Plaintiff's feet two years prior (in 2005) were "unremarkable." (*Id.*)

Next, the ALJ discussed two sets of records from Stout Street Clinic, including

records from Judith Wilson, M.D., and noted that "Dr. Wilson repeatedly indicated that

[Plaintiff] presented in no acute distress." (*See* AR 22 (discussing AR 262-270, 279-

316).)

Finally, the ALJ discussed records from the Denver Health Medical Center, which

noted that, although an examination revealed positive carpal compression and positive

Phalen's with an equivocal Tinel's bilaterally, Plaintiff had a negative Tinel's at her elbow

and negative elbow flexion test, and Plaintiff's motor and sensory examinations were

intact, without deficits in the radial or median nerve distribution.  (AR 22.)[10]

---

[9]   Despite a normal range of motion in her cervical and thoracic spine, Plaintiff had "decreased extension" of her lumbar spine.  (AR 233.)

[10]   Moreover, upon review of the record, the Court finds additional support for the ALJ's credibility determination.  For example, during the March 30, 2010 Hearing before the ALJ, Plaintiff testified that she cannot do much around the house, she stays at home, she tries to

In addition to the objective medical evidence, the ALJ also based her credibility determination on non-medical evidence such as Plaintiff's daily activities and Plaintiff's attempts to alleviate her pain.  (AR 24.)  With respect to the former, the ALJ pointed to a Function Report Plaintiff completed on June 27, 2008, in which Plaintiff stated that she washes dishes, does laundry, and dusts.  (ALJ's Decision at AR 24; Function Report at AR 162.)  The ALJ also pointed to Plaintiff's other activities such as visiting family, preparing small meals, watching television, reading, and going to the park.  In addition, the ALJ noted that, despite complaints of severe pain, Plaintiff took only Advil and Ibuprofen for pain relief; the record lacks any evidence of prescription pain medication. Additionally, despite reports of disabling pain caused by carpal tunnel syndrome, Plaintiff simply uses a splint and has not had medically recommended surgery.  (AR 24.) Moreover, despite Plaintiff's stated distrust of physicians, the ALJ duly noted that Plaintiff has undergone surgeries in the past to treat an incisional hernia and toe problems.  (*Id.*)

Accordingly, based on the foregoing, the Court finds that the ALJ identified the specific evidence upon which she relied in determining that Plaintiff's allegations of disability were not credible and the ALJ's credibility determination was based on

---

read but cannot comprehend a lot of things, she has problems sleeping, she limits the extent of her grocery shopping to a few small items from a convenience store that is one block away from where she lives, prepares herself microwaveable meals, and she keeps to herself and does not have any friends.  (AR 44-46.)  However, medical records from just a year prior to the March Hearing reflect that Plaintiff was sleeping and feeling a lot better; did not feel as "cloudy" as she used to; Plaintiff was able to spend some time in the park with her grandchild; she took a two-week trip to Santa Fe; during office visits, Plaintiff's thought process was logical and coherent; and Plaintiff was suffering from less anxiety.  (AR 296-309.)

substantial evidence.  Therefore, the ALJ's credibility determination is not a basis to

reverse the Commissioner's denial of Social Security benefits.

    2.    <u>Evaluation of the Medical Source Opinion Evidence – Opinions of Nurse Lynn Bodensteiner and Dr. Burton Rosenblum, Consultative Examining Psychologist</u>

Pursuant to 20 C.F.R. § 404.1527(d)(2), the ALJ must consider certain factors

when assessing treating medical source opinions.  The opinion of a treating source is

generally given controlling weight.  An ALJ can disregard a treating source opinion only

if it is contradicted by other medical evidence or otherwise inconsistent with substantial

evidence in the record. *See Marshall v. Astrue*, 315 F. App'x 757 (10th Cir. 2009)

(unpublished); 20 C.F.R. § 404.1527(d)(2).  The analysis as to how much weight to

accord a treating source opinion is sequential.

> An ALJ must first consider whether the opinion is well-supported by
> medically acceptable clinical and laboratory diagnostic techniques.  If the
> answer to this question is "no," then the inquiry at this stage is complete.
> If the ALJ finds that the opinion is well-supported, he must then confirm
> that the opinion is consistent with other substantial evidence in the record.
> In other words, if the opinion is deficient in either of these respects, then it
> is not entitled to controlling weight.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (internal quotation and

citation omitted); *see also* 20 C.F.R. § 404.1527(d)(3) ("The more a medical source

presents relevant evidence to support an opinion, particularly medical signs and

laboratory findings, the more weight we will give that opinion. The better an explanation

a source provides for an opinion, the more weight we will give that opinion.")

If a treating source's opinion is not given controlling weight, the ALJ must "give

good reasons" and consider a list of regulatory factors. *Watkins*, 350 F.3d at 1301 (reversing denial of benefits where the ALJ failed to articulate the weight, if any, he gave the treating source's opinion, and the reasons for assigning that weight or for rejecting the opinion); *see also* 20 C.F.R. § 404.1527(d)(2).[11] Though the ALJ must consider all these factors, she need not discuss all of them. *See Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished). The ALJ's decision must be specific enough to make clear to subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *See Watkins*, 350 F.3d at 1300-01; *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996); *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

"Treating source means [the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. The term, "acceptable medical source" means licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists, who are either treating sources, nontreating sources, or nonexamining sources, who provide evidence about the claimant's impairments. *Id.*; 20 C.F.R. § 404.1513(a).

---

[11]   These regulatory factors include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)(i), (d)(2)(ii), (d)(3)-(d)(6).

a.    *Nurse Bodensteiner*

Plaintiff seeks reversal of the Commissioner's denial of benefits on grounds that the ALJ failed to accord adequate weight to the opinion of Plaintiff's treating mental health nurse, Lynn Bodensteiner.  (Doc. # 11 at 6, 14-16.)  In particular, Plaintiff asserts that the "opinion of a non-medical source who has seen the claimant in her professional capacity may be determined to outweigh the opinion from a medical source."  (*Id.* at 14-15).  Alternatively, Plaintiff asserts that, even if the ALJ correctly determined that Nurse Bodensteiner's opinion was not entitled to controlling weight, the ALJ failed to discuss the factors set forth in 20 C.F.R. § 404.1527(d) concerning the evaluation of medical source opinions.  (*Id.* at 15.)

At the outset, the Court notes that the Commissioner need not, but **may** consider a nurse practitioner's opinions concerning Plaintiff's limitations. *See* 20 C.F.R. §§ 404.1513(a) and (e), 416.913(a) and (e) (stating that while a nurse practitioner is not an "acceptable medical source" under the regulations, a nurse practitioner does qualify as an "other source" whose opinions may be considered). Further, with respect to disability determinations, "[a] physician's opinion [concerning whether a claimant is disabled] is not dispositive, because the final responsibility for determining whether a disability exists is reserved for the Commissioner. Under the appropriate regulations, the opinion of a nurse practitioner is entitled to even less weight." *Cathey v. Barnhart*, 61 F. App'x 584, 586-87 (10th Cir. 2003) (unpublished) (internal citation omitted) (citing 20 C.F.R. § 404.1513(a); *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000)).

20

"Information from [ ] 'other sources' [such as nurse practitioners] cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." S.S.R. 06-03p, 2006 WL 2329939, at *2.

In the instant case, in her April 22, 2010 Decision, the ALJ acknowledged Nurse Bodensteiner's records and opinions contained within the file, specifically a Med-9 form that Nurse Bodenstein completed on September 9, 2009, in which she opined that Plaintiff would be disabled for twelve months or longer due to paranoia, visual hallucinations, feelings of worthlessness, insomnia, and auditory hallucinations (AR 271-272); and a March 15, 2010 letter in which Nurse Bodensteiner briefly described Plaintiff's mental health history, noted that Lexapro had rendered Plaintiff relatively stable, stated that Plaintiff started taking Klonopin 0.5mg to treat her panic attacks, and noted the effectiveness of Plaintiff's regular talk therapy sessions.  (AR 358-59.)  Also in the March 15, 2010 letter, Nurse Bodensteiner noted that Plaintiff continues to experience anxiety, depressed mood, insomnia, paranoia, fear, and panic attacks, "which greatly impact her functions of daily activity."  (AR 359.)  Nurse Bodensteiner further opined that Plaintiff's "ability to perform any job activity would be moderately to markedly impaired."  (*Id*.)  The ALJ also pointed to a treatment note from July 9, 2009, in which Nurse Bodensteiner noted that, as a result of taking Lexapro, Plaintiff was not

feeling depressed and was feeling much happier and more hopeful, engaged in less negative self-talk, was less paranoid, was experiencing less anxiety, and was less scared.  (AR 296.)  Finally, although the ALJ acknowledged Nurse Bodensteiner's assigned GAF score of 40-45, the ALJ explained that Nurse Bodensteiner's treatment notes, which show a concreteness, logic, and coherence in Plaintiff's thought process, and overall improvements in Plaintiff's mood, paranoia, and anxiety, do not support such a low GAF score, which signifies "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  (Doc. # 11 at 11) (quoting *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition).

In sum, the ALJ's consideration and discussion of Nurse Bodensteiner's opinions and treatment notes is specific enough to make clear to this Court the weight given (*e.g.*, "not entitled to any special weight") and the reasons for that weight (*e.g.*, unsupported by relevant evidence and inconsistent with the record as a whole).  Although Plaintiff complains that the ALJ failed to discuss the regulatory factors set forth in 20 C.F.R. § 404.1527(d), the Court notes that the ALJ did specifically say that she considered all these factors and she made clear that her decision rested on at least some of them, namely the extent to which Nurse Bodensteiner's opinions were inconsistent with and unsupported by the evidence in the record.  As noted above,

while  the ALJ must consider all the regulatory factors, she need not discuss all of them. *See Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished).[12]

Accordingly, the Court finds no error in the ALJ's evaluation of Nurse Bodensteiner's opinions.

> b.    *Dr. Rosenblum*

With respect to Dr. Rosenblum, nowhere in her Complaint (Doc. # 3) or in her Opening Brief (Doc. # 11) did Plaintiff assert error with respect to the ALJ's evaluation of Dr. Rosenblum's opinion.  However, in her Reply Brief, Plaintiff asserted, for the first time, that the ALJ erred in according little weight to Dr. Rosenblum's opinions.  (Doc. # 13 at 3).  The Court will consider the merits of this argument because it was presented in response to arguments the Commissioner made in his Response Brief.  (Response Brief, Doc. # 12 at 17-20.)

On March 16, 2010, at the request of Plaintiff's attorney, Dr. Rosenblum conducted a consultative evaluation of Plaintiff for a total of 180 minutes.  (*See* AR 361-374, 376-386.)  Half of that time was devoted to "live interaction and testing" and the other half of that time was devoted to "supervised testing by self." (AR 361.)  On a Mental Impairment Questionnaire, Dr. Rosenblum opined that Plaintiff is "seriously limited, but not precluded" in her ability to understand and remember very short and

---

[12]    Moreover, during oral argument before this Court, Plaintiff's attorney acknowledged that Nurse Bodensteiner's opinions were based on Plaintiff's own subjective statements and that the record lacks any objective evidence that substantiates the purported severity of Plaintiff's mental impairments.  (*See* Rough Transcript from June 6, 2011 Hearing at 9:10:52-9:13:54.)

simple instructions.  (AR 363.)  He also opined that Plaintiff is "unable to meet competitive standards" in a number of areas, including remembering work-like procedures, carrying out very short and simple instructions, and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.*)  Additionally, Dr. Rosenblum opined that Plaintiff has "no useful ability to function" in a number of other areas, including maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; dealing with normal work stress; interacting appropriately with the public; and maintaining socially appropriate behavior.  (AR 363-364.)  In support, Dr. Rosenblum points to results of various tests he conducted, all of which led him to conclude that Plaintiff "is severely emotionally dysfunctional especially regarding extremely low capacity to deal with people.  She is ongoingly distorting perceptions and is actively ongoingly dealing with auditory hallucinations[.]" Dr. Rosenblum determined Plaintiff had a GAF score of 40 (AR 361).

With respect to the four broad functional areas, Dr. Rosenblum opined that Plaintiff had the following limitations:

- Activities of daily living: Moderate limitations;
- Maintaining social functioning: Extreme limitations;
- Maintaining concentration, persistence, and pace: Marked limitations; and
- Episodes of decompensation within a 12-month period: Four or more

(AR 365).  However, also on March 19, 2010, Dr. Rosenblum completed a Psychiatric Review Technique form and assessed **more severe** limitations in two instances, **without any explanation**, as follows (differences are in bold):

24

- Activities of daily living: **Marked** limitations
- Maintaining social functioning: Extreme limitations
- Maintaining concentration, persistence, or pace: **Extreme** limitations; and
- Episodes of decompensation: Four or more

(AR 386.)  Additionally, Dr. Rosenblum indicated that Plaintiff exhibited seclusiveness, suspiciousness, and oddities of perception.  (AR 383.)

The Commissioner must give substantial weight to the treating physician's opinion and less weight to the opinions of doctors, such as Dr. Rosenblum, who have examined but not treated the claimant.  *See Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995); *Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir. 1987); *Higgins v. Barnhart*, 294 F. Supp. 2d 1206, 1211 (D. Kan. 2003). The opinions of examining sources, such as Dr. Rosenblum, are to be evaluated based upon the same regulatory factors as treating source opinions, which are set forth in 20 C.F.R. §§ 404.1527(d); 416.927(d). *See Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003); *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). Though the ALJ must consider all these factors, he need not discuss all of them. *See Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished). The ALJ's decision must be specific enough to make clear to subsequent reviewers the weight given to the medical source's opinion and the reasons for that weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003); *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996); *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

In the instant case, in the April 22, 2010 Decision, the ALJ provided a detailed summary of Dr. Rosenblum's opinions and a specific and clear explanation as to the

reasons why she accorded those opinions, including the assessed GAF score of 40,

"little weight." (AR 17-18.) In particular, the ALJ discussed such regulatory factors as

the unexplained inconsistencies between the two sets of limitations that Dr. Rosenblum

assessed on the same day, lack of record support for Dr. Rosenblum's noted instances

of four episodes of decompensation of an extended duration,[13] Dr. Rosenblum's one-

time visit with Plaintiff, and the inconsistencies between Dr. Rosenblum's assessment

and the record as a whole. (AR 18.) Further, the Court notes that Dr. Rosenblum's

assessment appears to be largely based on Plaintiff's subjective responses concerning

her mental impairments, which responses and which assessment fails to acknowledge

the improvements that Nurse Bodensteiner had observed in Plaintiff's condition, as a

result of medication and therapy. Furthermore, unlike *Simien v. Astrue*, No. 06-5153,

2007 WL 1847205, at *2 (10th Cir. June 28, 2007) (unpublished), in which the appellate

court determined that the ALJ erred in ignoring the claimant's GAF scores, this ALJ

addressed precisely why she was according the GAF scores little weight.

   Accordingly, the Court finds no error in the ALJ's evaluation of Dr. Rosenblum's

opinion.

---

[13]   During oral argument before this Court, Plaintiff's attorney conceded that the record lacks any evidence of episodes of decompensation of an extended duration. (*See* Rough Transcript of June 6, 2011 Hearing at 9:08:48-9:09:32.)

**C.    WHETHER THE ALJ'S RFC DETERMINATION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE**

Finally, Plaintiff asserts that the ALJ's RFC determination was not supported by substantial evidence.  Specifically, Plaintiff asserts that the ALJ failed to perform a "function-by-function" assessment of Plaintiff's ability to perform work-related activities, including Plaintiff's ability to perform the basic mental demands of unskilled work; failed to consider the side effects of Plaintiff's medications (*e.g.*, incontinence); failed to consider the combined effects of Plaintiff's diabetes, chronic foot pain, hypertension, and hyperlipidemia; and failed to consider the impact of obesity on Plaintiff's ability to work.  (Doc. # 11 at 5-6, 10, 12-13, 16-17.)

"RFC assessment is a task reserved for the ALJ, not doctors."  *Redding v. Astrue*, No. 08-cv-00861, 2009 WL 1392063, at *5 (D. Colo. May 18, 2009) (unpublished) (citing *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004)). While it is true that an ALJ must consider all of a claimant's impairments in assessing RFC, an ALJ is not required to discuss all the evidence she considers. *See Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.").  As discussed in S.S.R. 96-8p, the RFC assessment must be based on all the relevant evidence in the record, including medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; and effects of symptoms, including pain.  Additionally, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not

"severe," because a "not severe" impairment may, in combination with other impairments, render a claimant disabled.  S.S.R. 96-8p, at *5.

"Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately (*e.g.*, 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours')[.]" *Id.*  Additionally, "[i]t is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work."  *Id.*

Nonexertional capacity "assesses an individual's abilities to perform physical activities such as postural, manipulative, visual, communicative, and mental.  In addition to these activities, it also considers the ability to tolerate various environmental factors." *Id.* at *6 (internal paranthetical omitted).  "[N]onexertional capacity must be expressed in terms of work-related functions. . . .  Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  *Id.*

Finally, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.* laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations).  In assessing

RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7.

The burden is on Plaintiff to establish "a prima facie case of disability at steps one through four[,]" including the RFC assessment. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The Court's role, in turn, is limited to reviewing "the *sufficiency* of the evidence, not its weight [.]" *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). So long as that evidence is relevant and adequate to support the ALJ's conclusions,[14] the Court will not disturb the decision.

The Court finds no error in the ALJ's assessment of Plaintiff's RFC.  With respect to Plaintiff's ability to perform the basic mental demands of unskilled work, in the April 22, 2010 Decision, the ALJ considered Plaintiff's anxiety with respect to each of the four broad functional areas set forth in the regulations for evaluating mental disorders.  (AR 16-17.)  After discussing the evidence in the record, the ALJ concluded that Plaintiff had **no limitations** in activities of daily living, **no limitations** in social functioning, **mild limitations** in concentration, persistence, and pace, and **no episodes** of decompensation which have been of extended duration.  (AR 16.)  Additionally, the ALJ

---

[14]   *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (defining "substantial evidence").

acknowledged the existence of opinions that assessed greater limitations, but explained why she accorded those opinions "little to no weight."  (AR 17-19.)

Accordingly, the Court finds that the ALJ's RFC assessment of Plaintiff's mental impairment, determination that Plaintiff has only minor limitations, and conclusion that Plaintiff could perform unskilled work satisfied the regulatory requirements.

Next, with respect to Plaintiff's physical limitations, the ALJ looked to Plaintiff's daily activities and explained the reasons why she accorded "great weight" to the opinions of Dr. Laura Moran, a state consultative examining physician, who, upon examining Plaintiff in November 2007, concluded that Plaintiff could "sit for the entire day with stretch breaks, stand and walk for about 30 minutes at a time and alternate that with sitting for a total of eight hours per day, [ ] bend and squat," and lift and carry about 20 pounds, but may have difficulty doing repetitive motions with her right hand." (AR 21) (discussing opinions at AR 234-35).  The ALJ also explained the reasons why she accorded "great weight" to the opinions of Dr. James McElhinney, a State agency medical consultant, who, upon review of "the complete record, which included more detailed and comprehensive information than what was available to Dr. Wilson, [Plaintiff's] treating source,"[15] concluded that Plaintiff could lift and carry approximately 10 pounds frequently and 20 pounds occasionally, without any postural or manipulative limitations.  (AR 23) (discussing opinions at AR 351).

---

[15]   (AR 23).

Accordingly, the Court finds that the ALJ's RFC assessment of Plaintiff's physical impairments (*i.e.*, carpal tunnel syndrome and obesity), and conclusion that Plaintiff could perform "light work, involving only frequent handling/grasping and fingering with the right hand" satisfied the regulatory requirements.

## IV.  CONCLUSION

Accordingly, IT IS ORDERED THAT:

(1)     The ALJ's denial of social security disability benefits is AFFIRMED; and

(2)     Each party shall pay its own costs and attorneys' fees.

DATED:  June __13__, 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge